Filed 10/19/20  P. v. Oberdiear CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B287387 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA087410) |
| v. | |
| STEVE CLARK OBERDIEAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Upinder Kalra, Judge.  Conditionally reversed with directions.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Yun K. Lee and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Steve Clark Oberdiear appeals from a judgment after a jury convicted him of stalking (Pen. Code, § 646.9, subd. (a)),[1] two counts of making a criminal threat (§ 422, subd. (a)), and sending a writing with intent to extort (§ 523).  Oberdiear argues that the trial court erred:  (1) in allowing him to revoke his self-represented status and having standby counsel appointed to represent him on the condition that there would be no further continuances; (2) in denying his motion to reopen the case prior to the reading of the jury's verdict; (3) in excluding evidence of alleged witness bias; and (4) in failing to give the jury a unanimity instruction on the section 523 intent to extort count.  Oberdiear further argues that the prosecutor committed prejudicial misconduct during closing argument and that the case should be remanded to determine Oberdiear's eligibility for mental health diversion under section 1001.36.  Finally, Oberdiear asserts the trial court violated his right to due process by imposing assessments and a fine absent evidence of his ability to pay.

Because the trial court prejudicially erred in failing to give the unanimity instruction on the section 523 count, we reverse Oberdiear's conviction on that count.  In addition, as required by the Supreme Court's recent decision in *People v. Frahs* (2020) 9 Cal.5th 618, 624 (*Frahs*), we conditionally reverse the remaining convictions and the sentence and direct the trial court to conduct a hearing on Oberdiear's eligibility for mental health diversion under section 1001.36.  If the court does not grant diversion, or if Oberdiear does not successfully complete diversion, the trial

---

[1]     Undesignated statutory references are to the Penal Code.

2

court shall reinstate the conviction on the stalking and making criminal threat counts, and the People shall have 60 days to determine whether to retry Oberdiear on the section 523 count. If the People decide not to retry him on that count, or after the retrial of the section 523 count, the court shall resentence Oberdiear. In the event the trial court resentences Oberdiear, the court shall allow Oberdiear an opportunity to request a hearing and present evidence demonstrating his inability to pay any applicable fine or assessments.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Los Angeles County District Attorney filed a felony complaint against Oberdiear on May 19, 2014. The trial court held a preliminary hearing on August 20, 2014. In an information filed on September 3, 2014, the District Attorney charged Oberdiear with stalking (§ 646.91, subd. (a); count 1), attempted extortion (§§ 520, 664; count 2), two counts of making a criminal threat (§ 422, subd. (a); counts 3 and 4), and receiving stolen property (§ 496, subd. (a); count 5). On November 11, 2016, the trial court dismissed receiving stolen property (count 5), and on May 25, 2017, the trial court dismissed attempted extortion (count 2) and ordered the information amended to add sending a writing with intent to extort (§ 523; count 6).

### A. *Evidence at Trial*

#### 1. *Oberdiear's History with Shawn Sedaghat*

Oberdiear had been close friends with Shawn Sedaghat[2] for 30 years. He was the best man at Shawn's wedding and often

---

[2] For clarity, we refer to the Sedaghat family members by their first names.

3

spent time with Shawn's family. In 2002, Shawn founded PKG Group, a cosmetics packaging company. Oberdiear worked for PKG as an information technology (IT) consultant. In October 2011, Oberdiear and Shawn had a business dispute that ended their personal and professional relationships. At that time, Shawn told Oberdiear he should not return to PKG.

2. *Oberdiear's Text Messages to Shawn*

In December 2013, Oberdiear made an unexpected visit to PKG's office. Although Shawn was not at PKG at the time, Oberdiear asked to see Shawn's father, Shapour, who had an office at PKG. When Shawn's assistant informed him that Oberdiear was at PKG, Shawn instructed her to ask Oberdiear to leave. While Oberdiear was visiting with Shapour, Shawn's assistant walked into Shapour's office and announced that Shapour had an appointment. Oberdiear said goodbye to Shapour and other PKG employees, and left the office without incident. Oberdiear later sent a text message to Shawn, stating: "I stopped by the office to visit you, my brother. I seen Shapour not looking good. Everyone seemed to miss me. Hope all is well with you." Shawn did not respond.

On January 30, 2014, Oberdiear sent a text message to Shawn stating, "I'm taking all your cosmetics customers bitch. My fun now starting, dude." Shawn understood this message to mean that Oberdiear was threatening his business. A few months later, on April 8, 2014, Oberdiear sent another text to Shawn, stating: "I warned you, pal, to never eff me. People are coming for you Tony Montana. You are no longer safe in America. I suggest you pay them what you owe me with interest or, Shawn, you're over." The text message caused Shawn to feel "very fearful." Shawn denied altering the text messages he

4

received from Oberdiear.

3.      *Oberdiear's Text Messages to Shawn's Employee*

Starting in March 2014, Oberdiear sent a series of text messages to Jim Zaun, a PKG employee who previously had worked with Oberdiear. Zaun knew that Oberdiear believed Shawn owed Oberdiear money for work he had done for PKG. Oberdiear's text messages to Zaun included the following statements about Shawn:

"I hate the guy for what he did to his mother. He is so lucky to still be breathing."

"Everyone up north wants to kill him too."

"He has 24 hours to let me know. He, my friend, and sorry and making it right or his life is over as he knows it. . . . I know all your e-mails, all the customers. E-mails are loaded into the program. Soon that e-mail blast going out."

"Shawn make[s] horror movies. I make payback movies and I'm making a documentary only 39.95. How to payback someone with no friends that uses you as his best man, burns you."

"I have 27 years of hurtful shit Shawn has done to people to at least more than Snowden on N.S.A. 24 hours or all the photos of Shawn and the girls, airplane, hotels, go up and e-mails go out."

"I've waited a long time for Shawn to wise up, make right. Once I wake up in the morning, he's Bin Laden to me. 27 years of pain and flame coming out. I truly feel sorry for his family."

"Collect my million. Shawn and family no longer safe. Should move out of USA. Last warning to make right. E-mails going out two hours."

"Shawn has two hours before his hell begins. Collection felons coming to visit him at work, house. . . . These people are 100 percent gang members I hired. . . . Girls looking for Natasha to give D.V.D. today of her sick husband. Will meet up on her daily walks."

"My daughter and her friends looking for Shawn's boys. It's time they know the truth about Dad. Jim, you have no idea what about to happen. Nowhere to run when the devil comes to take your soul. These guys going to Shawn and Shapour's house. They going to wait outside. They know he is a sick gambler with millions. Last chance or addresses get sent. Checkmate. . . . I'm giving the collection guys this number and Shawn, Eddie, and slowly the rest. I'm sorry you or Shawn feel I'm joking. All in!"

"I call myself PKG Group now. L.O.L. You guys are beyond fools. Tell Shawn my uncle Ken, president of Rockwell, gave me his license to kill given to him by the Prez of the United States. So you have been warned. Next flight Shawn is mine."

"I want money and lots of it or I swear to God I'm going to get him."

Zaun promptly shared the text messages he received from Oberdiear with Shawn. Zaun did not alter any of the texts. When Shawn read the messages, he perceived them to be threats against him and his family.

4. *Oberdiear's Text Messages to Shawn's Wife*

On April 10, 2014, Oberdiear sent Shawn's wife, Natasha, several text messages. In the first text, Oberdiear wrote, "Letters going out to every PKG customer with photos. Again allowing Shawn to get away with murder is your world now. I suggest you take your boys and run." In another text message, Oberdiear stated, "I'm posting all the photos of the hookers and Shawn if

6

Shawn don't pay me in full." In a third text message to Natasha, Oberdiear warned, "My guys are coming for Shawn now. Natasha, you're not safe. Shawn has endangered you and your boys. Once you learn he stole millions in weed and not paid grower, I'm giving them your address too."

As soon as Natasha received these text messages, she shared them with Shawn. Natasha was afraid and alarmed by the text messages because Oberdiear "knew my children well. He knew where they went to school." When Shawn read the text messages Oberdiear sent to Natasha, Shawn testified, he "was very fearful that [Oberdiear was] coming after [Shawn] and [his] family. Shawn was aware that Oberdiear was in possession of his mother's gun and that Oberdiear knew where Shawn and his family lived. Because he believed Oberdiear intended to carry out his threats, Shawn reported the text messages to the police, obtained a restraining order against Oberdiear, and hired a security company to provide protection for his family.

5.      *Police Investigation*

On May 15, 2014, a law enforcement team, including Beverly Hills Police Detective David Williams, executed a search warrant at Oberdiear's residence. The police recovered computers, Oberdiear's cell phone, and a firearm registered to Oberdiear's mother. Williams used a forensic software program to access the text messages on Oberdiear's phone and to generate a forensic exam report that included the text messages sent to Shawn, Natasha, and Zaun. In generating the report, Williams did not edit or alter any of the text messages. The software only allowed Williams to collect information already stored on the device; it did not permit him to add any data.

7

Williams testified that "spoofing" occurs when a person sends a text message using a phone number that does not belong to the actual device associated with that number. A person could use a spoofing application to send a text message from his or her cell phone while making it appear the text message was sent from a different device. A person also could use a spoofing application to impersonate both sides of a text conversation between two cell phones. The software that Williams used to access the text messages on Oberdiear's cell phone would not show if spoofing had occurred.

B.     *Jury Verdict and Sentencing*

The jury found Oberdiear guilty of two counts of a making criminal threat (§ 422; counts 3 and 4), one count of stalking (§ 646.9, subd. (a); count 1), and one count of sending a writing with intent to extort (§ 523; count 6). Prior to sentencing, the trial court suspended the proceedings for an evaluation of Oberdiear's mental competence. After finding Oberdiear competent, the trial court sentenced Oberdiear to an aggregate state prison term of three years and eight months, composed of the middle term of three years for sending a threatening writing with intent to extort (count 6) and eight months for making a criminal threat (count 4). The trial court imposed and stayed a three-year term for stalking (count 1) under section 654 and reduced one of the making a criminal threat convictions (count 3) to a misdemeanor and sentenced appellant to a 364-day term. The trial court also imposed $2,080 in assessments and a fine.

Oberdiear timely appealed.

8

## DISCUSSION

A. *The Trial Court Did Not Err in Conditioning the Granting of Oberdiear's Motion To Appoint Standby Counsel on No Further Continuances*

During the three years the case against Oberdiear was pending, Oberdiear alternated between having counsel represent him and representing himself. At the start of trial, Oberdiear represented himself, with standby counsel observing. However, immediately before opening statements, Oberdiear asked the court to revoke his self-represented status and to appoint standby counsel to represent him. The trial court denied Oberdiear's motion, but gave him the option to have standby counsel appointed on the condition that there would be no further continuances. Oberdiear argues the trial court's refusal to continue the trial to allow standby counsel to prepare violated his constitutional rights to due process and effective representation by forcing Oberdiear to accept unprepared counsel.

### 1. *Trial Court Proceedings*

After the People filed their felony complaint on May 19, 2014, the public defender represented Oberdiear. At the preliminary hearing on August 20, 2014, private counsel represented Oberdiear. When the court arraigned Oberdiear on September 3, 2014, the public defender represented him. On January 27, 2015, Oberdiear retained another private counsel to represent him. On April 18, 2016, the trial court granted Oberdiear's request to represent himself. Because Oberdiear stated he was unprepared, the trial court continued the trial.

When trial was set to begin on August 11, 2016, the trial court granted Oberdiear's motion to relinquish his self-represented status and retain new private counsel to represent

9

him.  As a result, the trial court continued the trial.  On December 27, 2016, shortly before the new trial date, Oberdiear's counsel informed the trial court that Oberdiear had fired him and that Oberdiear wanted to represent himself.  The following day, Oberdiear completed a waiver of his right to counsel under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).  The trial court carefully reviewed the waiver with Oberdiear and warned him of the possible consequences of his failure to abide by the rules of the court, including that the court could terminate his right to self-representation.  The trial court advised Oberdiear, "I probably would appoint backup counsel [for you] on this case.  And [if backup counsel] would have to step in, and that lawyer would be at an extreme disadvantage, maybe not as prepared—certainly not as prepared as you are."  Reading aloud several portions of the waiver form, the trial court advised Oberdiear, "I understand that if at some point an appointed attorney takes over my case, that attorney may be at a disadvantage, and that such a disadvantage will not be considered an issue on appeal."  After Oberdiear indicated he understood, the trial court found that Oberdiear had knowingly waived his right to counsel and granted his request to represent himself.

On January 4, 2017, the trial court appointed Brent Merritt to serve as standby counsel.  The trial court also granted Oberdiear's motion to continue the trial date, stating, "I have to tell you this is the last continuance in this case."  On May 16, 2017, Oberdiear moved for another continuance.  However, the trial court denied Oberdiear's request and ordered the case transferred for trial.  Later that day, Oberdiear renewed his

10

request for a continuance before the trial judge.[3]  After reviewing the case history and noting that the "initial trial date was set October 23, 2014," the trial court denied Oberdiear's request for a continuance.  The trial court ruled:  "By any reasonable interpretation, you've had more than adequate time and opportunity [to prepare] for a four count information alleging stalking as well as attempted extortion.  Any reasonable view of this case would indicate whether you were trained or not, this is a reasonable opportunity to be prepared."  During evidentiary hearings over the next several days, the trial court repeatedly admonished Oberdiear about his disruptive and disrespectful behavior in the courtroom.

Jury selection began on May 18, 2017.  On May 19, the trial court and the parties discussed evidentiary issues.  After jury selection concluded on May 22, the trial court ordered the jury to return the following day at 11:00 a.m. for pre-instructions and opening statements.  On May 23, 2017, at 9:00 a.m., after hearing argument, the trial court ruled on the motions in limine.  Several rulings were adverse to Oberdiear.

At 10:58 a.m. on May 23, Oberdiear informed the trial court that he did not want to represent himself.  Noting that Oberdiear's request was "midtrial and late" because he made the request after several days of evidentiary hearings and jury selection, the trial court asked Oberdiear if he was prepared to have standby counsel take over the case.  Oberdiear responded, "Yes, Your Honor."  After summarizing Oberdiear's "history of going back and forth with representation [by counsel] and pro per status as trial dates approach,"  the trial court asked Oberdiear

---

[3]    Judge Upinder Kalva.

why he no longer wanted to represent himself. Oberdiear replied: "It's because of your attitude, Your Honor, direct attitude. You have been unfair to me. You've ruled not just unfairly, but you've showed a clear bias toward me. And I feel the only fair chance I have of getting a fair trial is to bring in counsel that maybe you will be less prone to try to take advantage of." Oberdiear stated, "It's just because of you, your Honor."

In response to the trial court's inquiry if he was ready to proceed to trial, Oberdiear's standby counsel, Merritt, responded that he had not been given certain documents, but that he could "get up to speed quickly" once he received them. The prosecutor argued that delay in starting the trial would inconvenience the People's witnesses, including two witnesses who were waiting outside the courtroom and two others who were on call. The prosecutor further argued that Oberdiear was not only attempting to "prolong what has already been an incredibly protracted case," but also that Oberdiear was responsible if Merritt was not prepared. After reviewing the factors the court must weigh in ruling on a midtrial motion to revoke self-represented status, the trial court announced that its tentative decision was to deny Oberdiear's motion. The trial court found "demonstrable abuse by [Oberdiear] to attempt to delay" the trial as the "trial dates approach" based on Oberdiear's "prior history in the substitution of counsel and the desire to change from self-representation to counsel representation." The trial court also found: "Just because you don't like the rulings doesn't mean you can substitute and abandon. The reasons are, in my mind, seen as an opportunity to divert the core integrity of the court to try to take advantage, to disrupt and delay, which it appears from this record, the entire record, has been the strategy of Mr. Oberdiear."

12

The trial court further found, "The case [was] about disruption. The case strategy of Mr. Oberdiear has been about delay, and this would have unknown delay and a significant amount of disruption." Finally, the trial court found that Oberdiear was "very sophisticated" and "smart" and that "he would be effective enough" if he continued to represent himself. At Merritt's request, the trial court gave Merritt an opportunity to consult with Oberdiear over the lunch recess to determine if Merritt could announce ready for trial.

Following the lunch break, Merritt informed the trial court that he was not able to "announce ready" at that time and that he required a minimum of 10 days to prepare for trial. Merritt stated that he could not be ready because he had not reviewed expert reports and an investigator needed to interview witnesses. The trial court stated to Merritt, "As standby counsel, I'm sure you are familiar with the fact that you could be asked to step in at any point and you kind of just have to take the shoes of the pro per and whatever position they're in." Merritt stated, "But if the court is going to indicate that because Mr. Oberdiear has already been deemed ready and therefore stepping into his shoes I am deemed ready, then as his standby counsel serving at the request of the court, the answer is yes, I will take over the case today. I will not move for a mistrial based upon my presence." Merritt also stated that, if the trial court ordered him to step in for Oberdiear, he would request a continuance. The trial court indicated it "would deny that [request for a] continuance" because the jurors were "not qualified past June 2nd," and a continuance would "obstruct the orderly administration of justice."

After allowing Oberdiear another opportunity to confer with Merritt, the trial court stated:  "Mr. Oberdiear, to be clear, I would allow this, but on the condition that . . . I will not be granting any continuances.  We will not be delaying this case any longer.  I think any delay is unjustifiable based upon the history of this case and it is an attempt to essentially obstruct the orderly administration of justice, and the court will not allow that. . . . You get to make the choice.  You can proceed to represent yourself or Mr. Merritt can step in, and I will not be continuing the matter."  Oberdiear responded that he wanted Merritt to represent him, but that Merritt needed a continuance of "at least . . . a couple of days to review the material before we move forward."  The trial court reiterated that it would not grant any request to continue the trial and that Oberdiear would have to "unequivocally abandon [his] pro per status with the condition there will be no continuance."  When the trial court inquired what he wanted to do, Oberdiear replied, "I want to revoke my *Faretta* rights."

The trial court granted Oberdiear's motion:  "The court understands that it has discretion to deny this midtrial revocation and I've heard the People's position.  And I'm speaking now to the court of appeal and to a higher court.  If I deny this midtrial request, essentially, I'm incentivizing that Mr. Oberdiear engaged in misconduct.  Because, as I've warned him repeatedly, if he engages in misconduct, I will yank or revoke his pro per status involuntarily and appoint standby counsel.  It seems to me that this court should not incentivize such behavior.  At this point he is voluntarily requesting to abandon his pro per status knowing the fact that Mr. Merritt, although present during all of the proceedings before this court, has indicated that

he is at a disadvantage. Mr. Oberdiear, being aware of that, is still choosing to revoke his pro per status and, essentially, shackling Mr. Merritt by putting Mr. Merritt in a situation of having to step in the shoes that Mr. Oberdiear created, Mr. Oberdiear would still like trained counsel, Mr. Merritt, in particular. So I believe that although I have discretion to deny it and that this court does see this as an opportunity to try to build in error, create unjustifiable delay, and obstruct the orderly administration of justice based upon the history of this case and the conduct and misconduct of Mr. Oberdiear, I think in balance I'm going to exercise my discretion to have trained counsel with the limitations placed on the defense that there will be no continuances."

After Merritt asked for a continuance, the trial court reiterated that it had granted the motion on the condition there would be no further continuances. The trial court found, "A felony trial should be resolved in a matter of months and this has been pending for years. And most of the delay has been attributable to the defense as far as I can tell. The defense and solely for the defense has requested that the trial be vacated six times. And this would be the seventh time." The trial court ruled, "Based upon everything I've indicated, the motion to continue is denied."

On May 24, 2017 (Wednesday) the trial court advised Merritt that "we could go dark on Friday," which would give him a four-day weekend "to prepare for [Oberdiear's] defense." On May 25 (Thursday) the People rested, and the trial court continued the case until May 30 (Tuesday). On May 30, Oberdiear rested without presenting any evidence or requesting a continuance.

15

After the trial court instructed the jury, the jury began deliberations on the afternoon of May 30.  Shortly before noon on the following day, the jury notified the court clerk that it had reached a verdict.  Before the jury was brought into the courtroom, Oberdiear's counsel informed the trial court:  "This morning I learned there was a text contained in the data extraction off the iPhone and that this text indicates that it was sent on August 21, 2058."  Counsel stated that he had not previously discovered the information when he reviewed "the hundreds and hundreds of texts in the 125-or-so-page report by the expert."  Merritt moved to reopen the case to "allow the defense to a lay [a] foundation" for the text message and present it the jury to support "spoofing, which that seems consistent with."  The People objected that they had provided the expert report during discovery and that Oberdiear could have introduced the entry during the presentation of evidence.  The trial court denied Oberdiear's request to reopen.

2.      *Applicable Law*

A criminal defendant has a right to represent himself or herself at trial under the Sixth Amendment to the United States Constitution.  (*Faretta, supra,* 422 U.S. at p. 807.)  A trial court must grant a request for self-representation "'if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers.'"  (*People v. Williams* (2013) 58 Cal.4th 197, 252-253.)  A motion to revoke the right of self-representation and have counsel reappointed also must be timely and unequivocal.  (*People v. Frederickson* (2020) 8 Cal.5th 963, 1005.)  "'Equivocation . . . may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation, or

16

where such actions are the product of whim or frustration.'" (*Id.* at p. 1006.)

In deciding whether to grant a motion to revoke the defendant's right to represent himself or herself made after trial has commenced, the trial court must consider, along with any other relevant circumstances: "'(1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.'" (*People v. Lawrence* (2009) 46 Cal.4th 186, 192.) Ultimately, however, "the trial court's discretion is to be exercised on the totality of the circumstances, not strictly on the listed factors." (*Ibid.*) We review a trial court's ruling on a motion to revoke a defendant's right to represent himself or herself for abuse of discretion. (*People v. Frederickson*, *supra*, 8 Cal.5th at p. 1006; *Lawrence*, at p. 193.)

A trial court also has broad discretion in deciding whether to grant or deny a continuance. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 508; *People v. Reed* (2018) 4 Cal.5th 989, 1004.) In determining whether there is good cause for a continuance, the court considers "whether the moving party has acted diligently, the anticipated benefits of the continuance, the burden that the continuance would impose on witnesses, jurors, and the court, and whether a continuance will accomplish or hinder substantial justice." (*Reed,* at p. 1004; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1037 ["[a] showing of good cause

17

requires a demonstration that counsel and the defendant have prepared for trial with due diligence"].) "The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked." (*People v. Beames* (2007) 40 Cal.4th 907, 920.) "[D]iscretion is abused only when the court exceeds the bounds of reason, all circumstances being considered." (*Ibid; see Jenkins,* at p. 1037 ["the trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial"].)

3. *The Trial Court Did Not Err in Allowing Oberdiear To Revoke His Self-Represented Status on the Condition of No Further Continuances*

Oberdiear's motion to revoke his self-represented status and have standby counsel appointed to represent him was not timely or unequivocal. After the trial court deemed Oberdiear ready for trial and repeatedly denied his requests for a continuance, Oberdiear made his motion after the jury had been sworn and with the understanding that trial was anticipated to last approximately two weeks. When the trial court inquired about Oberdiear's reason for seeking to revoke his pro per status, his response demonstrated that he was frustrated with the trial court's evidentiary rulings and was seeking to further delay the proceedings. In explaining his request, Oberdiear told the trial court: "You've made some unfair rulings today to exclude all of the exculpatory evidence . . . and let in all the hearsay evidence. . . . So with that said, Your Honor, I asked initially that you give me more time. You said no. And all I can tell you this is a result of that."

18

In deciding whether to grant Oberdiear's motion to revoke his self-represented status, the trial court found: (1) Oberdiear had a history of switching back and forth between self-representation and representation by counsel; (2) Oberdiear's stated reason for the request was that he disagreed with the trial court's latest rulings; (3) the case had been pending for three years, and a jury had been empaneled with the expectation trial would be completed within two weeks; (4) Oberdiear's strategy was to disrupt and delay the proceedings; and (5) Oberdiear appeared capable of effective self-representation. However, rather than deny the motion outright, the trial court gave Oberdiear the option of having standby counsel appointed, but on the condition that the court would not grant any further continuances. Oberdiear does not dispute that "the court could have denied [his] request and made him continue as his own attorney." Instead, Oberdiear contends that the trial court "could not simply eliminate [his] right to any continuances" when it granted Oberdiear's request for counsel. Oberdiear is incorrect.

In the analogous situation when a defendant makes a midtrial motion to switch from representation by counsel to self-representation, a trial court may condition granting such a request on the defendant's agreement to immediately proceed with trial without a continuance. (See *People v. Valdez* (2004) 32 Cal.4th 73, 103; *People v. Jenkins, supra,* 22 Cal.4th at p. 1039; *People v. Clark* (1992) 3 Cal.4th 41, 110.) In *People v. Clark* the defendant contended the trial court "improperly conditioned its grant of his [midtrial] *Faretta* motion on waiver of any necessary continuance . . . ." (*Clark,* at p. 110.) In rejecting this contention, the Court held, "Although a necessary continuance must be granted if a motion for self-representation is granted, it is also

19

established that a midtrial *Faretta* motion may be denied on the ground that delay or a continuance would be required. [Citations.] . . . [The] trial court made clear its intent to deny the *Faretta* motion as untimely if a continuance would be necessary. . . . The *Faretta* motion was ultimately granted only when defendant expressly represented he was able to proceed without a continuance." (*Ibid.*)

Further, in *People v. Jenkins, supra,* 22 Cal.4th 900, "the [trial] court warned defendant that a request for a continuance would constitute a basis for denying his motion to represent himself, and defendant accepted pro se status on the understanding that no additional time would be granted." (*Id.* at p. 1038.) After the court granted the defendant's midtrial motion to represent himself, the court denied the defendant's request for a continuance. In rejecting defendant's argument that the denial of a reasonable continuance for preparation deprived him of due process of law, the Court held, "In the present case, in ruling on defendant's midtrial motion to represent himself, the court correctly noted that it had authority to deny the motion if self-representation required a continuance, and, in advising the defendant of the perils of self-representation, it asked defendant whether he understood, among other things, that he would receive 'no extra time for preparation.' Defendant indicated he understood. In addition, when defendant secured permission to proceed pro se, the court already had denied counsel's request for a continuance for further investigation and preparation for the penalty phase of the trial. Defendant was no more entitled to a continuance when he became his own counsel than he was entitled to a continuance at former counsel's request." (*Id.* at p. 1039; see *People v. Valdez, supra*, 32 Cal.4th at p. 103 [where

20

defendant made a *Faretta* motion moments before jury selection was to begin, the court "acted within its discretion in concluding that defendant could represent himself only if he was ready to proceed to trial without delay"].)

Relying on *People v. Espinoza* (2016) 1 Cal.5th 61 (*Espinoza*), Oberdiear asserts that, once the trial court decided to grant his motion, it also had to grant a continuance so long as there was a reasonable basis for requesting one. According to Oberdiear, the trial court "could not simply eliminate [Oberdiear's] right to any continuances." *Espinoza* does not support Oberdiear's argument. The defendant in *Espinoza* "had worked his way through seven defense counsel over the course of nearly two and a half years before, at the last moment, deciding to proceed pro se . . . ." (*Id*. at p. 77.) Before granting his *Faretta* motion, the trial court advised the defendant that he "could proceed pro se if he was ready to continue with the already commenced trial." (*Id*. at p. 81.) The trial court also warned the defendant that, "if he chose to represent himself, he was 'not going to get any continuances unless they are reasonable requests, which given the time frame we've given to the jurors we need to move forward with this case. I'm not going to be extending it beyond [the two-week] time limit I gave to the jurors.'" (*Ibid*., italics omitted.) When the defendant inquired whether, if he represented himself, he could receive a one-day continuance to obtain materials from the public defender, the court responded "no," indicating that it believed the defendant already had the necessary materials. (*Ibid*.)

On appeal, the defendant in *Espinoza* argued that the trial court erred in denying his request for a continuance. (*Espinoza*, *supra*, 1 Cal.5th at p. 80.) The Court disagreed: "[T]he record

21

shows the trial court did not grant defendant's *Faretta* motion and then subsequently deny defendant's motion for a one-day continuance. It instead acted within its discretion to condition the grant of defendant's *Faretta* motion on his ability to immediately proceed to trial unless he had a reasonable basis for a short continuance. When defendant suggested that if he were granted leave to represent himself, he would need a one-day continuance in order to obtain materials from the public defender's office, the court indicated it would not grant such a continuance because it did not believe defendant's claim that he did not have all of the materials to which he was entitled. The record provides no basis for us to question that determination and we find no error in this respect." (*Id.* at pp. 81-82.)

Contrary to Oberdiear's characterization, the Court in *Espinoza* did not hold that a trial court must permit a reasonable continuance whenever it grants a *Faretta* motion. Rather, the Court held that, based on the facts in that case, the trial court did not abuse its discretion when it "told defendant that it would condition the grant of his *Faretta* motion on [his] ability to proceed with trial with only reasonable continuances that would not extend the trial beyond the two-week estimate given to the jury." (*Espinoza, supra,* 1 Cal.5th at p. 81.) Indeed, rather than carve out a reasonable continuance exception, the *Espinoza* court reaffirmed the principle that "[a] trial court may also condition the grant of an untimely *Faretta* motion on a defendant's ability to immediately proceed to trial." (*Id.* at p. 80.)

Thus, when a defendant sought to change midtrial from representation by counsel to self-representation, the Supreme Court held that the trial courts can "condition the granting of the right of self-representation on defendant's waiver of a

22

continuance." (*People v. Jenkins, supra,* 22 Cal.4th at 1039.) Similarly, when a defendant makes a midtrial motion to revoke his or her self-represented status and have counsel appointed for the remainder of the trial, the trial court has the discretion to manage an ongoing trial by conditioning the granting of the motion on no further delay. Here, with Oberdiear's several-year pattern of "demonstrable abuse" and "disruption" by changing counsel and his represented status, Oberdiear has not shown the trial court erred by giving him the option of continuing to represent himself or having standby counsel appointed. But, in either event, the trial would continue without interruption. Thus, the trial court did not abuse its discretion in indicating that it would deny Oberdiear's motion to withdraw his self-represented status for all the reasons it stated and at the same time advising Oberdiear that standby counsel could represent Oberdiear so long as the trial was not delayed. After an exhaustive discussion with the trial court, Oberdiear chose to have standby counsel represent him.

The record here supports the trial court's ruling on Oberdiear's motion. Indeed, Oberdiear does not challenge the trial court's finding that he caused most of the delay in getting this case to trial. The trial court set this case for trial in October 2014. Because trial dates had been vacated six times at Oberdiear's request, the trial court found Oberdiear had engaged in "demonstrable abuse" to attempt to delay "as trial dates approach." The trial court reasonably found "the strategy of Mr. Oberdiear" has been "to disrupt and delay." Given Oberdiear's history of actively seeking to disrupt and delay the proceedings, the trial court reasonably concluded that his latest *Faretta* revocation motion and request for a continuance were intended to

23

"create unjustifiable delay" and to "obstruct the orderly administration of justice."

In December 2016, before it granted Oberdiear's most recent *Faretta* motion, the trial court advised him that, if standby counsel became his trial counsel, "that lawyer would be at an extreme disadvantage." At that time, although the trial court granted Oberdiear's request for a continuance, the trial court told Oberdiear that "this is the last continuance in this case." In May 2017, the trial court also denied Oberdiear's two pretrial requests for a continuance. When Oberdiear made the motion to revoke his self-represented status, the trial court advised Oberdiear that, while its tentative ruling was to deny his motion, standby counsel could act as his trial counsel on the condition that the court would grant no further continuances. The trial court also made clear to Oberdiear that, if he chose to revoke his right to self-representation, he should make "this decision with eyes wide open" and "be aware of the . . . dangers and disadvantages of Mr. Merritt stepping in at this late stage." As the People correctly note, Oberdiear "voluntarily chose that option; the trial court did not order or otherwise require [him] to do so." The trial court also reasonably concluded that any further delay would pose hardship to the empaneled jurors who had been prescreened for a two-week trial; would inconvenience the witnesses, including those who were present in court to testify that day; and would allow Oberdiear to continue his pattern of disruption and delay.

Oberdiear also contends that, "[b]y conditioning Merritt's appointment on absolutely no continuances being even considered, the trial court violated [his] constitutional rights to due process and reasonably effective counsel." Oberdiear argues: "Prejudice is established by the counsel discovering a text

24

message that was dated 2058 in the cell phone documents, evidence that would have supported [Oberdiear's] defense that the texts that formed the basis for all of the charges had been spoofed." Presumably, Oberdiear is suggesting that, had the trial court granted Merritt's request for a 10-day continuance, Merritt would have discovered the "2058" text message entry on the People's expert report. Oberdiear's argument, however, is unpersuasive. Since May 2014, when the People filed the felony complaint, this case has been based on Oberdiear's text messages, and Oberdiear and his various counsel had the ability to obtain his cell phone records. Oberdiear had the People's 125-page expert report containing an analysis of Oberdiear's cell phone months before trial started. Standby counsel, appointed in January 2017 and given the four-day weekend after the People rested to prepare, had sufficient opportunity to review the People's expert report. In any event, standby counsel was expected to be ready to act as trial counsel without delay in the event that Oberdiear's right of self-representation was terminated. (See *People v. Moore* (2011) 51 Cal.4th 1104, 1119, fn. 7 ["standby counsel . . . takes no active role in the defense, but attends the proceedings so as to be familiar with the case in the event that the defendant gives up or loses his or her right to self-representation"]; *People v. Blair* (2005) 36 Cal.4th 686, 725 ["'[s]tandby counsel' is an attorney appointed for the benefit of the court whose responsibility is to step in and represent the defendant if that should become necessary"], disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919.)

In this case, standby counsel was stepping into the shoes of a defendant who had repeatedly caused delay by alternating between self-representation and representation by counsel, and

waited until moments before opening statements to request that standby counsel take over the case. Oberdiear was "no more entitled to a continuance" when standby counsel was appointed to take over his representation than he was entitled to a continuance when he was representing himself. (See *People v. Jenkins*, *supra*, 22 Cal.4th at p. 1039 [no error in conditioning grant of defendant's midtrial *Faretta* motion on his waiver of a continuance]; *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1689 ["if the court determines the defendant's request is merely a tactic designed to delay the trial, the court has the discretion to deny the continuance and require the defendant to proceed to trial as scheduled either with his counsel or in propria persona"]; see generally *People v. Reed*, *supra*, 4 Cal.5th at p. 1004 [no error in denial of continuance where "trial court did not act arbitrarily in believing that any continuance would impose a significant burden on everyone involved in the trial"]; *People v. Alexander* (2010) 49 Cal.4th 846, 935 [no violation of due process or effective representation where trial court's denial of continuance "was within the bounds of reason given the defense's apparent lack of diligence as weighed against the length of time the case had been pending and the court's concern that it not continue to drag on"].) As the Supreme Court has observed, however, "not every denial of a request for more time can be said to violate due process, even if the party seeking the continuance thereby fails to offer evidence. . . . Instead, '[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" (*People v. Beames*, *supra*, 40 Cal.4th at p. 921.) "'[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon

26

expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.'" (*Alexander,* at pp. 934-935.) Under these circumstances, the trial court did not abuse its discretion or violate Oberdiear's constitutional rights in granting his motion to revoke his right to represent himself on the condition that trial would proceed without delay.

B.    *The Trial Court Did Not Abuse Its Discretion in Denying Oberdiear's Motion To Reopen the Case*

Oberdiear contends that the trial court erred in denying his motion to reopen prior to the reading of the jury's verdict. Oberdiear claims that reopening was necessary to allow him to present to the jury a text message entry on the People's expert report that supported his "spoofing" defense.

1.    *Background*

After the jury indicated that it reached a verdict, Oberdiear asked to reopen to present a text message entry erroneously dated August 21, 2058. As discussed, Oberdiear's counsel stated that he had just discovered the entry when reviewing "the hundreds and hundreds of texts in the 125-or-so-page report by the expert." The trial court denied Oberdiear's motion: "Mr. Oberdiear is in this position simply because he did not have counsel. He's had this case, he's had discovery for years. In regard to whether your counsel has a disadvantage because counsel did not have a chance to go through every document, that's Mr. Oberdiear's fault. It's no one else's. I did extend the case. We broke early on Thursday. We broke early on Wednesday. We took Friday off. We had a four-day holiday. There was an opportunity for the defense to present a defense and/or ask for further time. Yesterday you indicated you did not need additional time and you rested. The jurors have

27

deliberated.  They've announced that they have a verdict.  If you like, you can always file a motion for a new trial, if you get to that stage.  But your request to reopen at this stage is denied."

### 2. *The Trial Court Did Not Err in Denying Oberdiear's Motion to Reopen*

"'A "motion to reopen [is] one addressed to the [trial] court's sound discretion." [Citation.]  In determining whether an abuse of discretion occurred, the reviewing court considers four factors: "'(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence."'"'" (*People v. Masters* (2016) 62 Cal.4th 1019, 1069; accord, *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 637.)  Here, the trial court acted well within its discretion in denying Oberdiear's motion to reopen.

First, Oberdiear made the motion at a very late stage.  When Oberdiear asked to reopen, the jury already had reached a verdict on all counts.  The jury was waiting to be called into the courtroom for the reading of the verdict.  (See *People v. Funes* (1994) 23 Cal.App.4th 1506, 1520 [trial court did not abuse its discretion in denying motion to reopen where "jury had already been deliberating for nearly a full day before defense counsel made his request"].)

Second, the trial court reasonably found that Oberdiear had not been diligent in discovering the "2058" text message entry on the People's expert report.  Since they filed the felony complaint in May 2014, the People predicated their case on Oberdiear's text messages.  Although he did not present any supporting evidence, Oberdiear's only defense, spoofing, was

28

based on the claim that the text messages did not originate from his cell phone. The People gave Oberdiear the report analyzing the text messages extracted from his cell phone well before trial began. At a hearing on December 28, 2016, almost five months before trial, the trial court directed the prosecutor to provide Oberdiear's investigator with a compact disc containing all "cell phone reports." At a May 19, 2017 pretrial hearing regarding evidentiary issues, the prosecutor confirmed that Oberdiear had been given a copy of the People's 125-page forensic expert report. Further, although Oberdiear's counsel admitted he had reviewed the expert's report and that he had been standby counsel since January 4, 2017, he did not notice the specific text message entry in the report. "The trial court was entitled to rely on defendant's lack of diligence in denying the motion to reopen." (*People v. Monterroso* (2004) 34 Cal.4th 743, 779; see also *People v. Jones* (2012) 54 Cal.4th 1, 67 ["no abuse of discretion in refusing to reopen where 'the evidence the defense sought to offer at reopening was indisputably available *during* the trial'"].)

Third, given that the jury had already reached a verdict, there was a risk it would accord the proffered evidence undue emphasis if Oberdiear was allowed to reopen. After the People's witnesses denied they altered Oberdiear's text messages, Oberdiear did not present any evidence to support his spoofing defense. In his closing, Oberdiear's counsel argued the "spoofing theory that the text messages may not have originated from Oberdiear's phone." If Oberdiear was permitted to reopen his case after the jury reached a verdict solely for the purpose of introducing the "2058" text message entry, the jury might have placed undue weight on this single piece of evidence once it restarted deliberations. (*People v. Funes*, *supra*, 23

Cal.App.4th at p. 1521 ["'one of the reasons underlying the requirement of diligence is that a jury may accord undue weight to evidence which is admitted close to the time deliberations begin'"].)

Fourth, Oberdiear did not show the significance of the "2058" text message entry. Oberdiear claims the incorrect date on the text message entry was "solid and concrete evidence that supported the theory that the text had been spoofed." However, Oberdiear did not make an offer of proof regarding whether an erroneously dated text message in the People's expert report tended to show spoofing. Oberdiear never presented any expert testimony or other evidence to explain how spoofing might have occurred. It is also unclear whether the "2058" text message was one of the threatening text messages sent to the victims, or was one of the hundreds of other irrelevant text messages that were retrieved from Oberdiear's cell phone. Thus, although spoofing was Oberdiear's "primary defense," Oberdiear never explained why the single text message entry was "vital to establishing" that spoofing occurred. (See *People v. Homick* (2012) 55 Cal.4th 816, 882 [no error in denial of motion to reopen made before closing arguments where "proffered evidence was insufficiently significant to warrant reopening the evidence"].) The trial court did not abuse its discretion in declining to reopen the case after the jury had reached a verdict.

Oberdiear's reliance on *People v. Newton* (1970) 8 Cal.App.3d 359 and *People v. Frohner* (1976) 65 Cal.App.3d 94 is misplaced. In *People v. Newton*, the court held that the trial court abused its discretion in refusing to reopen to allow an eyewitness's prior statement to be corrected to change the word "did" to "didn't," in reference to whether the witness saw a "clear

30

picture" of the defendant's face. The witness's eyewitness account of the shooting "was the only direct trial evidence that defendant was the person who fatally shot" the police officer, and the "prosecution had vigorously emphasized the word 'did'" in closing argument. (*Newton*, at pp. 381, 384.) In *People v. Frohner*, the People violated their duty to "'undertake reasonable efforts in good faith to locate'" an informer who was "potentially a material witness on the issue of guilt." (*Frohner*, at p. 103.) After the prosecutor in closing argument improperly argued that defendant failed to call the informer as a witness, the defendant located the informer shortly before jury reached a verdict. (*Id.* at p. 110.) Under these circumstances, the court held, "we must conclude that the prosecution's failure to make reasonable efforts to locate [the informer] and the trial court's refusal to allow [the informer] to be called as a witness severely prejudiced defendant's case." (*Id.* at p. 111.)

C.    *The Trial Court Did Not Err in Excluding Evidence Concerning Shawn's Businesses*

Oberdiear argues the trial court erred in excluding evidence that Shawn owed him money and was engaged in the medical marijuana business because it was relevant to showing Shawn's bias against him. According to Oberdiear, "If Shawn owed [Oberdiear] a large sum of money, [Shawn] would be incentivized to spoof the texts in order to get [Oberdiear] to leave him alone." Oberdiear argues, "the erroneous exclusion of this evidence violated appellant's Sixth and Fourteenth Amendment rights to confront the principal adverse witness, to present a complete defense, and to a fair trial." Oberdiear, however, did not argue in the trial court that the excluded evidence related to his spoofing defense.

31

### 1. *Relevant Proceedings*

At a pretrial evidentiary hearing, the People argued that the references in Oberdiear's text messages to Shawn's involvement in the medical marijuana business were irrelevant and unduly prejudicial. Oberdiear asserted that Shawn's ownership of over 200 medical marijuana dispensaries under the corporate entity Seawolf LLC was relevant because "that was our business and work relationship and why he decided not to pay me." Oberdiear asserted, "that's our direct working relationship and I still have stock payments that I have the name Seawolf with his signature on it." The trial court excluded the evidence: "The prejudicial effect outweighs any probative value. I don't even see what the relevance is, but the marginal relevance is significantly outweighed by the prejudicial effect. What's relevant is that you had a business relationship. You want to refer to it as Seawolf, go right ahead. But the nature of the business, I don't see it at all being relevant."

The People also asked the trial court to exclude evidence that Shawn was involved in gambling and owed money to Oberdiear. In response, Oberdiear argued that the gambling references in his text messages were relevant because one of his responsibilities was to organize poker games for Shawn, but he had not been paid for his services. Oberdiear wanted to introduce the evidence of Shawn's gambling "just to establish [Shawn] owes me money." Oberdiear also asserted the evidence that Shawn owed him money was relevant to explain why he continued to send text messages to Shawn after their relationship ended. The trial court ruled the evidence was inadmissible: "The fact that you believed, even legitimately and even if it's true, that you were owed a business debt is excluded. It is not a defense to the crime

of extortion or attempted extortion."

Prior to the start of trial, the trial court reviewed the text messages to determine whether redactions were appropriate given its evidentiary rulings. In discussing one text message that included language Shawn had "stole millions in weed and not paid growers," the trial court asked Oberdiear what he intended to elicit. Oberdiear responded that there were many people who worked for Shawn's marijuana business who had not been paid for their services. Oberdiear explained that he wanted to present video evidence of "50 protesters . . . at [Shawn's] weed store in Sacramento that have dogs [and] that are holding signs that say fucking pay me." The trial court excluded evidence regarding medical marijuana dispensaries and protests, instructing Oberdiear, "You will not be going into the fact that there are protests up north. . . . You have not established any relevance to that. And any relevance would be substantially outweighed by any probative value. It would create undue prejudice, it would lead to confusing of the issues and it would mislead the jury as to what is relevant." With respect to the text message that Shawn had "stole millions in weed," however, the trial court told the prosecutor that he could not simply redact the reference to Shawn stealing weed and not paying growers without changing the context. The People presented that text message without redaction. The trial court further ruled, "because there was some mention of weed in some text messages that the People are going to offer, I will allow a little latitude that there's some business connections."

During trial, Shawn testified that he was a "reserve police officer." Outside the presence of the jury, Oberdiear argued that evidence of Shawn's participation in the medical marijuana

33

business was now relevant because it was a violation of federal law [for a police officer] to engage in the medical marijuana business." Oberdiear argued he should be able to examine Shawn regarding "illegal conduct." The trial court denied the request, explaining that unless Oberdiear could identify a specific law or policy that barred a reserve police officer from engaging in the medical marijuana business, the evidence of Shawn's involvement in the business was not relevant.

Later in his testimony, Shawn stated that he had hired a "security company to provide security for my family" because he was "scared that [his family was] going to be hurt" based on Oberdiear's threats. Oberdiear sought permission to inquire whether Shawn had hired security because "he was the target of other threats" due to his business activities. At an Evidence Code section 402 hearing, Shawn denied that he had a dispute with anyone else concerning money or that he feared anyone other than Oberdiear when he hired the security firm. Shawn testified that, while he was aware of the protests at a marijuana dispensary in Sacramento for which he had provided consulting services, the protests were about "corporatizing medical marijuana" and were not directed at him personally.

Following the hearing, the trial court ruled that Oberdiear could ask Shawn if he had reason to fear anyone other than Oberdiear, but could not inquire about the marijuana business or the protests in Sacramento. The trial court found Oberdiear's proffered evidence was not relevant to show that Shawn feared someone other than Oberdiear. Even if there was some relevance, the trial court ruled that Oberdiear's evidence regarding the protests in Sacramento was inadmissible under Evidence Code section 352. The trial court ruled: "But to have a

claim where there's some protests at a business in some other part of California and the basis of that protest was corporatization of, his belief, of the marijuana industry, and to suggest that that is a direct threat and he is not to be believed in front of this jury, that . . . he actually had fear and fear to himself or his family and he hired security, you're going to need to make a much stronger proof before I allow you to offer any evidence in that area. So if you want to ask him right now does he have any other fear for hiring security, I'll allow you to ask that question. But to go into this other area to try to draw a connection, you, it's incumbent upon you to make a much stronger offer of proof. . . . With essentially no evidence, it's just supposition, suspicion, speculation, conjecture, or guesswork. And that's not an offer of proof of facts. And even if that was a marginal offer of proof of admissible evidence, I find that under 352 that it would so confuse the issue, it would be so prejudicial, it would be inappropriate for that type of evidence under 352 to come in. On the one hand, I don't find it is relevant with admissible evidence. Moreover, if it was under 352, I would exercise my discretion to exclude it."

2. *The Trial Court Did Not Err Limiting the Admission of Evidence Concerning Shawn's Business Dealings and Debt to Oberdiear*

Oberdiear asserts evidence of Shawn's indebtedness to him, Shawn's involvement in a medical marijuana business, and the protests against the medical marijuana dispensary in Sacramento, was admissible because it was relevant to show that Shawn had a bias against Oberdiear and a reason to harm him by spoofing his text messages. Oberdiear argues: "If Shawn owed [Oberdiear] a large sum of money, he would be incentivized

to spoof the texts in order to get [Oberdiear] to leave him alone." Oberdiear further argues, "the depth of their contentious relationship, which could have been informed by the extent of any debt, could have caused Shawn to seek to harm [Oberdiear]." Oberdiear did not, however, raise this theory of relevance before the trial court. Instead, Oberdiear argued that the proffered evidence was relevant because it explained: the nature of his business relationship with Shawn; Oberdiear's continued text messages to Shawn after their relationship ended; Shawn's fear of someone other than Oberdiear; and Shawn's possible violations of federal law in his business dealings. Because Oberdiear never contended the evidence was relevant to proving Shawn's bias or motive to fabricate the text messages, he has forfeited this argument on appeal. (Evid. Code, § 354; *People v. Loker* (2008) 44 Cal.4th 691, 739 [defendant's failure to raise specific theory of admissibility at trial forfeited claim on review]; *People v. Hart* (1999) 20 Cal.4th 546, 606 [same].) Even if it was not forfeited, Oberdiear's argument lacks merit.

"Only relevant evidence is admissible at trial. [Citation.] Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects." (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) "'A trial court's decision to admit or exclude evidence is a matter committed to its discretion ""'and will not be disturbed except on

36

a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.”’”’ (*People v. Masters*, *supra*, 62 Cal.4th at p. 1056.) In *People v. Rodrigues* (1994) 8 Cal.4th 1060, the Supreme Court held: “Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion ‘must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.’” (*Id.* at p. 1124.)

In determining the credibility of a witness, the jury may consider “any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness’s] testimony . . . .” (Evid. Code, § 780.) “The ‘existence or nonexistence of a bias, interest, or other motive’ on the part of a witness ordinarily is relevant to the truthfulness of the witness’s testimony [citation], and “‘[t]he credibility of an adverse witness may be assailed by proof that he cherishes a feeling of hostility towards the party against whom he is called . . . .”’” (*People v. Williams* (2008) 43 Cal.4th 584, 634.) “However, [Evidence Code] section 780 does not require that all questions relating to a witness’ credibility be allowed on cross-examination; nor does it mandate the admission of all evidence offered to show a motive to fabricate. [Citation.] Evidence of a witness’ conduct must *unequivocally* point to a possible motive to fabricate testimony before it is admissible. [Citation.] Moreover, evidence of such a motive need not be admitted where the theory behind the alleged motive to

37

fabricate is highly tenuous, speculative, conjectural or based on 'possibilities.'" (*People v. Johnson* (1984) 159 Cal.App.3d 163, 168.) "Trial judges retain 'wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, [and] confusion of the issues . . . .'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

Here, the trial court reasonably concluded that evidence of Shawn's involvement in the medical marijuana business was not relevant. The trial court ruled the fact that Oberdiear and Shawn had a business relationship that ended acrimoniously was relevant. The jury heard evidence that Shawn and Oberdiear had a dispute that ruptured their long-term relationship. However, the trial court found that the nature of Shawn's business and whether it involved marijuana was not relevant to whether Oberdiear committed the offenses. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10 ["A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice"].)

Oberdiear argues that the fact that unpaid growers protested Shawn's marijuana business was relevant because Shawn had "reason to prevent [Oberdiear] from communicating to others whom Shawn might have owed money, and Shawn could have intended to accomplish this by sending the police after him." Oberdiear's argument is based on conjecture. At the Evidence Code section 402 hearing, Shawn testified that he was aware of protests at the medical marijuana dispensary in Sacramento for which he had provided consulting services;

38

however, he denied the protests were directed at him or had anything to do with the nonpayment for services.  Oberdiear did not make an offer of proof to support a theory that Shawn wanted to silence him or prevent Oberdiear from communicating with anyone.  As stated, Oberdiear did not make an offer of proof that Shawn, or anyone acting on Shawn's behalf, could have spoofed his text messages.  Further, to the extent that evidence of Shawn's medical marijuana business had any probative value, the trial court reasonably found it was substantially outweighed by the risk that its admission would confuse the issues and mislead the jury.  The trial court was within its discretion in excluding these matters.  (See *People v. Peoples* (2016) 62 Cal.4th 718, 757 ["[t]he decision to exclude evidence 'will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice'"].)

The trial court also reasonably exercised its discretion in limiting the admission of evidence that Shawn allegedly owed money to Oberdiear.  As the trial court noted, whether Oberdiear legitimately believed he was owed money was irrelevant because it was not a defense to the charged crimes.  (See *People v. Lancaster* (2007) 41 Cal.4th 50, 88 ["claim-of-right defense does not extend to the crime of extortion"]; *People v. Tufunga* (1999) 21 Cal.4th 935, 955 ["courts will not recognize a good faith defense to the satisfaction of a debt when accomplished by the use of force or fear"].)  Moreover, the trial court reasonably could have concluded that a determination whether Shawn owed money to Oberdiear, and if so, how much, would have necessitated an undue consumption of time and created a substantial risk of confusing or misleading the jury.  Under these circumstances, we

39

see no abuse of discretion in the exclusion of such evidence. (See *People v. Avila* (2006) 38 Cal.4th 491, 584 [no error in excluding evidence of potential witness bias where probative value "was, at best, weak" and "was substantially outweighed by the probability that its admission would necessitate undue consumption of time or create substantial danger of undue prejudice"]; *People v. Hart, supra*, 20 Cal.4th at p. 607 [evidence of victim's alleged motive to lie was properly excluded where its admission "would have permitted the focus of the testimony to shift away from the events leading to and involving the charged offenses," and the "trial court acted within its discretion in determining that such a shift presented a substantial risk of confusing or misleading the jury"].)

The jury heard evidence that Oberdiear and Shawn were involved in a business dispute that pertained, at least in part, to Oberdiear's belief that Shawn owed him money. Shawn admitted at trial that he and Oberdiear had a business dispute that ended their long-term personal and professional relationship. Furthermore, Oberdiear's former coworker, Zaun, testified that Oberdiear "felt that Shawn owed him money for the work he had done with the company." Some of the text messages presented at trial also referenced Shawn's alleged indebtedness, including one in which Oberdiear warned Shawn that he should pay "what you owe me with interest or . . . you're over."

The trial court's evidentiary rulings did not violate Oberdiear's federal constitutional due process rights to present a defense. As the Supreme Court has recognized, except in unusual circumstances, ""the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic

40

power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.”’” (*People v. Lawley* (2002) 27 Cal.4th 102, 155; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 26 [“‘[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant’s constitutional rights”].) Here, the trial court acted within its discretion in limiting the admission of evidence on collateral issues that were substantially likely to confuse the jury and to consume an undue amount of time. Oberdiear has not demonstrated a violation of his constitutional rights.

### D. *The Unanimity Instruction Was Erroneous and Requires Reversal of the Section 523 Conviction*

Oberdiear argues that the trial court prejudicially erred by failing to give a unanimity instruction in connection with the section 523 intent to extort count. He reasons that, because the unanimity instruction referred to “this offense” without identifying any specific count, and was given immediately after the criminal threat count instruction, the unanimity instruction applied only to the criminal threat counts and not to the section 523 count. The People assert that the unanimity instruction applied to each of the counts, and even if it did not, any error was harmless because extortion under section 523 does not require a unanimity instruction.

#### 1. *The Unanimity Instruction*

Over a several month period, Oberdiear sent text messages to Shawn, Zaun, and Natasha. Many of them contained threats and made demands. Under section 523, the transmission of a

41

single writing, with an intent to extort, can constitute the crime.[4] During the jury instruction conference, the trial court, addressing the prosecutor, stated, "It's a situation where there are numerous acts, not theories, but different acts that constitute the [offenses]. You've done a charging range for the [two counts of making a criminal threat (§ 422)] as opposed to discreet dates and . . . different acts that could constitute the extortion [§ 523]; and different acts that could constitute the credible threat [under the stalking count (§ 646.9(a))]. That is why I put unanimity, unless you want to elect." The People agreed with the trial court that the jurors would "all have to agree that a specific statement on a specific day was a threat or whatever it may be." In response to the trial court's question whether "the People aren't electing a particular act," the prosecutor stated, "Not at this time. I think I will probably point the jury to specific statements in my closing arguments." At the conclusion of the conference, the trial court

---

[4]     Section 523 provides, "Every person who, with intent to extort property or other consideration from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519 is punishable in the same manner as if such property or other consideration were actually obtained by means of such threat." Section 519 states, "Fear, such as will constitute extortion, may be induced by a threat of any of the following: [¶] 1. To do an unlawful injury to the person or property of the individual threatened or of a third person. [¶] 2. To accuse the individual threatened, or a relative of his or her, or a member of his or her family, of a crime. [¶] 3. To expose, or to impute to him, her, or them a deformity, disgrace, or crime. [¶] 4. To expose a secret affecting him, her, or them. [¶] 5. To report his, her, or their immigration status or suspected immigration status."

42

stated it would give "a general unanimity instruction."

The trial court instructed the jury regarding the charged crimes in the following order: (1) stalking, as charged in count 1 (§ 646.91, subd. (a)); (2) sending a writing with intent to extort, as charged in count 6 (§ 523);[5] and (3) making a criminal threat, as charged in counts 3 and 4 (§ 422). Immediately after reading the instruction on making a criminal threat, the trial court instructed the jury with the unanimity instruction, CALCRIM No. 3500: "The People have presented evidence of more than one act to prove that the defendant committed *this offense*. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed." (Italics added.)

---

[5] The trial court instructed the jury with CALCRIM 1831: "The defendant is charged in count 6 with sending a threatening letter or writing with the intent to extort in violation of Penal code section 523. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant sent or delivered a threatening letter or other writing to another person; [¶] 2A. In the letter or writing, the defendant threatened to unlawfully injure the other person or someone else; [¶] or [¶] 2B. In the letter or writing, the defendant threatened to expose a secret about the other person or that person's relative or family member the other person or someone else; [¶] AND [¶] 3. When sending or delivering the letter or writing, the defendant intended to use fear to obtain money or property with the other person's consent. [¶] The term *consent* has a special meaning here. Consent for extortion can be coerced or unwilling, as long as it is given as a result of the wrongful use of force or fear. . . . It is not required that the intended recipient actually give the defendant money or property. . . ."

43

Neither the People nor Oberdiear made any reference to the unanimity instruction in closing arguments. In his closing argument, the prosecutor referred to "a series of text messages" and "text messages over the period of several months." The prosecutor did not focus on specific text messages in connection with the section 523 count. Thus, although the prosecutor told the court at the jury instruction conference that he would "probably point" to specific text messages in closing argument, the prosecutor did not make an election tying certain text messages to the section 523 intent to extort count.

2. *Applicable Law*

In a criminal case, a jury verdict must be unanimous. (Cal. Const., art. 1, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132.) The jury also "'must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877-878; see *People v. Jennings* (2010) 50 Cal.4th 616, 679 ["when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty"]; *People v. Sutherland* (1993) 17 Cal.App.4th 602, 611-612 ["some assurance of unanimity is required where the evidence shows that the defendant has committed two or more similar acts, each of which is a separately chargeable offense, but the information charges fewer offenses than the evidence shows"].)

44

The prosecution makes an election by "tying each specific count to specific criminal acts elicited from the victims' testimony," typically in opening statement or closing argument. (*People v. Diaz* (1987) 195 Cal.App.3d 1375, 1382; accord, *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292; *People v. Mayer* (2003) 108 Cal.App.4th 403, 418-419; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455.)  In the absence of a prosecutor's election, a trial court has a sua sponte duty to give the jury a unanimity instruction where a single crime could be based on several possible acts.  (*People v. Diedrich* (1982) 31 Cal.3d 263, 280-281; see *People v. Crandell* (1988) 46 Cal.3d 833, 874-875 ["'[a]s long as there are multiple acts presented to the jury which could constitute the charged offense, a defendant is entitled to an instruction on unanimity'"]; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534 ["if the prosecution shows several acts, each of which could constitute a separate offense, a unanimity instruction is required"].)  "'In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.  In the first situation, but not the second, it should give the unanimity instruction.'" (*People v. Covarrubias, supra,* 1 Cal.5th at p. 878.) We review the trial court's failure to give a unanimity instruction de novo.  (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 751; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

3. *Instructional Error*

The trial court intended to give a unanimity instruction that applied to the counts for making a criminal threat and the

count for intent to extort.  The standard version of CALCRIM No. 3500 includes an introductory sentence to identify the specific offenses that are subject to the unanimity instruction and the counts to which they apply.  In giving CALCRIM No. 3500, however, the trial court omitted this introductory sentence.  The trial court also failed to pluralize the phrase "this offense" or otherwise specify that the unanimity instruction applied to the section 523 count.  The trial court needed to make clear that the unanimity instruction applied to the section 523 count because the unanimity instruction immediately followed the criminal threat instruction.

Generally, "[i]n reviewing an ambiguous instruction, we inquire whether there is a reasonable likelihood that the jury misunderstood or misapplied the instruction in a manner that violates the Constitution.  [Citation.]  'A single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury.'" (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 906; see *People v. Nelson* (2016) 1 Cal.5th 513, 544.)

The People contend that, because the unanimity instruction was immediately followed by the instruction in CALCRIM No. 3515 that each count charged is a "separate crime" that required the jury to consider each count separately and to return separate verdicts,[6] it is not reasonably likely the jury understood the unanimity instruction applied to only one of the counts.

---

[6]     The trial court instructed, "Each of the counts charged in this case is a separate crime.  You must consider each count separately and return a separate verdict for each one."

46

However, there was a reasonable likelihood the jury applied the unanimity instruction only to the criminal threat counts and not the section 523 count. Because the trial court gave the unanimity instruction immediately after the criminal threat instruction, the phrase "this offense" in the unanimity instruction logically and reasonably referred only to the immediately preceding criminal threat counts instruction. While the trial court also instructed the jury that "[e]ach of the counts charged" was "a separate crime" and that it needed to "return a separate verdict" for each count charged, the instruction on the section 523 count did not refer to the unanimity instruction. The prosecutor also did not tie a particular text message to the section 523 count. Therefore, the court did not instruct the jury it must unanimously agree on one specific text message as the writing that satisfied the element of a "threatening letter or writing" on the section 523 count. Accordingly, the trial court erred in failing to give the unanimity instruction in connection with the section 523 count.

### 4. *Prejudice*

Courts are divided on the prejudice standard that applies to the failure to give a unanimity instruction. Some courts have applied the state law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, and others have applied the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (See *People v. Hernandez, supra,* 217 Cal.App.4th at pp. 576-577.) In *People v. Hernandez,* the court explained why the *Chapman* standard was appropriate: "[F]ederal due process requires that the prosecution convince a jury of the defendant's guilt of the crime beyond a reasonable doubt. [Citation.] 'When the trial court erroneously fails to give a unanimity instruction, it allows a conviction even if all 12

47

jurors (as required by state law) are not convinced that the defendant is guilty of any one criminal event (as defined by state law). This lowers the prosecution's burden of proof and therefore violates *federal constitutional law*.' [Citation.] Because the error violates federal constitutional rights, the *Chapman* standard applies." (*Id*. at pp. 576-577.) Because the failure to give a unanimity instruction can lower the prosecution's burden of proof in a criminal case, an error of federal constitutional dimension, we apply the *Chapman* standard. (See *People v. Curry* (2007) 158 Cal.App.4th 766, 784; *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 186; *People v. Deletto* (1983) 147 Cal.App.3d 458, 472.)

The jury found Oberdiear guilty of all charges. It is reasonable to infer that the jury rejected Oberdiear's spoofing defense and found that he sent all the text messages in evidence. However, the prosecutor did not argue that every text message Oberdiear sent constituted a threat to extort under section 523. Nor do the People make that argument on appeal. Some jurors may have concluded that when Oberdiear sent some of the text messages he did not have an intent to extort through fear. Other jurors may have concluded he sent different messages with the intent to constitute a crime under section 523. For example, Oberdiear sent a text message to Zuan stating: "Shawn make[s] horror movies. I make payback movies and I'm making a documentary only 39.95. How to payback someone with no friends that uses you as his best man, burns you." In another text message to Zuan, Oberdiear more ominously threatened: "I want money and lots of it or I swear to God I'm going to get him." As Oberdiear argues, "jurors could have come to different conclusions regarding each [text message]."

48

Because a single writing sent with an intent to extort may violate section 523, and because Oberdiear sent many text messages to Shawn, Natasha, and Zaun, without a unanimity instruction or an election tying a specific text message to the count, there was no proof beyond a reasonable doubt the jury unanimously agreed that any particular message constituted the "threatening letter or writing" required for a section 523 conviction. For example, six jurors could have voted to convict Oberdiear based on the first text message quoted above, while six other jurors may have voted to convict Oberdiear based on the second text message quoted above. Even though the jury found that Oberdiear sent all the text messages, we cannot conclude beyond a reasonable doubt that the jury reached a verdict based on their unanimous agreement as to which text message constituted the threatening writing Oberdiear sent with the intent to extort. We therefore reverse Oberdiear's conviction on the section 523 count because the trial court's error in failing to give the unanimity instruction was not harmless beyond a reasonable doubt.

E.   *The Prosecutor's Statements in His Rebuttal Argument Do Not Warrant Reversal of Oberdiear's Convictions*

Oberdiear contends the prosecutor committed prejudicial misconduct during his closing argument. In particular, he claims the prosecutor: (1) misstated the law by suggesting that the standard of proof beyond a reasonable doubt could be quantified, and (2) improperly commented on Oberdiear's failure to present evidence to support a spoofing defense.

1. *Closing Arguments*

During his closing argument, Oberdiear's counsel focused on the spoofing defense. He noted the People's expert, Williams, had admitted that the software he used to retrieve the text messages from Oberdiear's cell phone would not show if spoofing had occurred. Oberdiear's counsel told the jury: "Now, I asked [Williams] whether data shows up and you can look at it and say, oh, that's a spoofed text, and he said no. The only way to look would be to examine the cellular telephone records for that phone, in this case, the iPhone. So I asked him, 'Did you examine any telephone records from the iPhone?' And he said, 'No.' That was not his job. That was the responsibility of the investigating officer with the Beverly Hills Police Department. But we do not hear from the investigating officer of the Beverly Hills Police Department. And we do not get to see any cellular telephone records for that iPhone."

After noting that Williams's forensic report also showed some variations with respect to how the retrieved text messages were displayed, Oberdiear's counsel argued, "Now, why is this important? This is important because the prosecution has the burden to show beyond a reasonable doubt. . . . And you heard that a lot, because it's . . . very important. And this is the type of thing that forms the basis of reasonable doubt. That you may believe something happened. You may believe Mr. Oberdiear was involved in that thing. But do you believe that beyond a reasonable doubt?"

In his rebuttal argument, the prosecutor described the concept of reasonable doubt as follows: "Here is what reasonable doubt is. The description. It's an abiding conviction. I'm not allowed to quantify that. The law doesn't let me say, well, that

means it's 65 percent or–can't do it, and I'm not going to suggest it.  Here's what I can tell you about reasonable doubt.  It's the same standard of proof in every criminal case in this country.  It's been around long before I was born.  It will probably be around long after I am gone.  Reasonable doubt is not the need to eliminate all possible doubt.  Everything in life is open to some possible or imaginary doubt."  Oberdiear's counsel did not object to the prosecutor's comments regarding the burden of proof.

Later in his rebuttal, the prosecutor addressed the issue of spoofing:  "This suggestion that the text messages weren't sent by the defendant.  There is no evidence that supports that.  No one came in, testified this phone is being used to spoof.  No one came in and testified and said, I sent those text messages from the defendant's phone, not the defendant.  There's no evidence to support it.  [Oberdiear's counsel] talked about cell phone records.  He said you could get cell phone records.  You could get those from AT&T or whomever, and they would show conclusively.  The defense has the exact same subpoena power that the People do."

Oberdiear's counsel objected that the prosecutor's statement about the phone records constituted improper argument.  After the trial court overruled the objection, the prosecutor continued:  "They have every right to call any witness that they want to come in and talk to you about the cell phone records.  And if there's one thing that would have tended to prove what they are suggesting, it would have been someone from AT&T [to] come in and say, the text messages that we see on the [screen] shots and on the forensic analysis of the phone are not accurately reflected in the AT&T records.  That didn't happen."

51

2.  *Applicable Law*

a.  *Prosecutorial misconduct*

"'"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."'"  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332; accord, *People v. Caro* (2019) 7 Cal.5th 463, 510 (*Caro*); *People v. Bell* (2019) 7 Cal.5th 70, 111; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)  Where, as here, "a claim of misconduct is based on the prosecutor's comments before the jury, . . . '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'"  (*Gonzales and Soliz,* at p. 305; see *Bell*, at p. 111 [prosecutor's use of coin-toss analogy to explain reasonable doubt standard was "problematic," but not misconduct, because it was not reasonably likely the jury would have understood argument to mean they could decide case by flipping a coin]; *People v. Cortez* (2016) 63 Cal.4th 101, 130-131 [prosecutor's statement in rebuttal argument that jurors could find proof beyond a reasonable doubt if they looked at the evidence and concluded "'"[they knew] what happened, and [their] belief [was] not imaginary"'" did not constitute misconduct because there was no reasonable likelihood jurors understood argument to mean they could convict based on '"nonimaginary"' belief supported by preponderance of evidence or strong suspicion]; cf. *People v. Centeno* (2014) 60 Cal.4th 659, 665, 670

(*Centeno*) [prosecutor's use of hypothetical in closing argument explaining concept of reasonable doubt using outline of shape of California with incomplete and inaccurate information constituted misconduct because it was not supported by evidence and was misleading].) "'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Flores* (2020) 9 Cal.5th 371, 403; *People v. Crew* (2003) 31 Cal.4th 822, 839.)

"'"To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.'" [Citation.] A court will excuse a defendant's failure to object only if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct." (*People v. Jackson* (2016) 1 Cal.5th 269, 349; accord, *People v. Fayed* (2020) 9 Cal.5th 147, 204; *People v. Beck and Cruz, supra*, 8 Cal.5th at p. 657; *Caro, supra,* 7 Cal.5th at p. 510.) "'Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 800; accord, *People v. Gray* (2005) 37 Cal.4th 168, 215.)

b. *Ineffective assistance of counsel*

To prevail on a claim of ineffective assistance of counsel, a defendant bears the burden to show (1) his or her "'"counsel's representation fell below an objective standard of reasonableness

53

under prevailing professional norms"'""" and (2) he or she "'""'suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.'""" (*People v. Johnson* (2016) 62 Cal.4th 600, 653; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687-692; accord, *People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).)

"On direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'"" (*Caro, supra,* 7 Cal.5th at p. 488; accord, *Mickel, supra,* 2 Cal.5th at p. 198 ["a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission"]; *People v. Lopez* (2008) 42 Cal.4th 960, 972 ["except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal"].) We presume "that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.'" (*Mickel,* at p. 198; accord, *People v. Bell, supra,* 7 Cal.5th at p. 125 ["'[u]nless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy"'"].)

As the Supreme Court in *Caro* explained in rejecting the defendant's argument his counsel's failure to object or request an admonition as to the prosecutor's penalty phase closing argument constituted ineffective assistance, "This is not the rare case

where there 'could be no satisfactory explanation' for the failure to object or request admonitions, which may have arisen from a desire not to call attention to the allegedly faulty arguments. [Citation.] The failure to object only rarely constitutes ineffective representation." (*Caro, supra*, 7 Cal.5th at p. 514; accord, *People v. Lopez, supra*, 42 Cal.4th at p. 972 ["'[d]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance'"].)

### 3. *Oberdiear Forfeited Any Argument the Prosecutor Misled the Jury Regarding the Standard of Proof Beyond a Reasonable Doubt*

Oberdiear argues the prosecutor committed misconduct during his rebuttal argument by suggesting that the standard of proof beyond a reasonable doubt could be satisfied by a 65 percent belief that he was guilty. Recognizing the likely forfeiture of this misconduct claim because his counsel failed to object, Oberdiear asserts that his trial counsel rendered ineffective assistance by failing to make a timely objection to the prosecutor's misstatement of law and to request a curative admonition.

The Supreme Court has explained, "'Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements.'" (*Centeno, supra*, 60 Cal.4th at p. 666; accord, *People v. Bell, supra,* 7 Cal.5th at p. 111; *People v. Cortez, supra,* 63 Cal.4th at p. 130.) A prosecutor commits misconduct in closing argument by implying that a lesser standard than the constitutionally

mandated proof beyond a reasonable doubt satisfies the People's burden. (*Centeno*, at p. 673 [prosecutor misstated burden of proof when she "repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence"].) A prosecutor also commits misconduct by attempting to assign a quantitative value to the concept of reasonable doubt. (See *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1267-1268 [using a puzzle of the Statue of Liberty composed of eight pieces, prosecutor's comments with the sixth piece of the puzzle in place, "'this picture is beyond a reasonable doubt,'" had the effect of "inappropriately suggesting a specific quantitative measure of reasonable doubt, i.e., 75 percent"].)

In this case, the prosecutor told the jury that he was "not allowed to quantify" reasonable doubt and that "[t]he law doesn't let [him] say, well, that means it's 65 percent," so he was "not going to suggest it." Citing *People v. Wrest* (1992) 3 Cal.4th 1088, 1107 (*Wrest*), Oberdiear contends that the prosecutor's statement was improper because it reflected the use of a rhetorical device known as "paraleipsis"; stating one thing by suggesting the opposite. In *Wrest*, *supra*, 3 Cal.4th 1088, the prosecutor told the jury in the penalty phase of a capital case that he did not have enough time to make all of the points he wanted to make so he had to edit some of them out. He then went on to list all of the specific arguments that he claimed he was not making, some of which constituted improper arguments about reasons to impose the death penalty. (*Id.* at p. 1106.) Finding misconduct, the Supreme Court held, "Although the prosecutor's comments here were strategically phrased in terms of what he was *not* arguing, they embody the use of a rhetorical device−paraleipsis−suggesting exactly the opposite. Repetition

56

of the statement, 'I am not arguing *X*,' strongly implied the prosecutor was in fact asserting the validity and relevance of *X*, but, for lack of time, was concentrating on other, presumably more important topics." (*Id.* at p. 1107.)

Here, although the prosecutor did not identify for the jury all of the arguments he purportedly was going to refrain from making about the standard of proof, we are troubled by the prosecutor's suggestion that the reasonable doubt standard could be quantified, and perhaps quantified as low as 65 percent. By mentioning "65 percent" in connection with the reasonable doubt standard, the prosecutor came close to committing misconduct by "dilut[ing] the People's burden." (*Centeno, supra,* 60 Cal.4th at p. 673.) "[J]udges and advocates have been repeatedly admonished that tinkering with the explanation of reasonable doubt is a voyage to be embarked upon with great care." (*Id.* at p. 671.) In *People v. Katzenberger, supra,* 178 Cal.App.4th 1260, while displaying a graphic to the jury, the prosecutor's suggestion of "a specific quantitative measure of reasonable doubt, i.e., 75 percent" constituted misconduct. (*Id.* at p. 1268.) However, we do not reach the question whether the prosecutor committed misconduct by misleading the jury about the applicable standard of proof. Because Oberdiear's counsel failed to object and request a curative admonition, Oberdiear forfeited his claim of prosecutorial misconduct. (See *People v. Hoyt* (2020) 8 Cal.5th 892, 942; *People v. Beck and Cruz, supra,* 8 Cal.5th at 657; *People v. Powell* (2018) 6 Cal.5th 136, 171.) Oberdiear does not argue that an objection would have been futile. (See *Centeno*, at p. 674 ["[a] prosecutor's misstatements of law are generally curable by an admonition from the court"].)

57

Oberdiear contends his counsel's failure to object to the prosecutor's reference to "65 percent" constituted ineffective assistance of counsel because "'the problems with the prosecutor's argument were not difficult to discern.'" But affording great deference to defense counsel, we cannot say Oberdiear's attorney had "'"'"no rational tactical purpose"'"'" for his failure to object. (*Mickel*, *supra*, 2 Cal.5th at p. 198; accord, *Caro*, *supra*, 7 Cal.5th at p. 514.) As the Supreme Court concluded in *Caro*, Obediear's attorney may have decided not to object to the prosecutor's statements "from a desire not to call attention to the allegedly faulty arguments." (*Caro*, at p. 514.) By objecting to the prosecutor's argument, Oberdiear's counsel would have highlighted the statement to the jury. Instead, Oberdiear's attorney could have made a tactical decision to rely on the jurors following the court's instruction that they "must follow the law as I explained it to you" and that, "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (See *Centeno*, *supra,* 60 Cal.4th at p. 675 ["'[t]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . . .' [citation], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence'"]; *People v. Stanley* (2006) 39 Cal.4th 913, 965-966 [failure to request instruction at penalty phase not to draw adverse inferences from the defendant's failure to testify may have reflected a tactical decision not to draw the jury's attention to the fact that he did not testify].)

4.    *The Trial Court Did Not Err in Ruling That the Prosecutor Did Not Improperly Comment on Oberdiear's Failure To Present Evidence*

Oberdiear asserts the prosecutor committed misconduct during his rebuttal argument by commenting on Oberdiear's failure to introduce his cell phone records. Oberdiear's claim of misconduct fails.

"'Prosecuting attorneys are allowed "a wide range of descriptive comment" and their ""'argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.'"'"" (*People v. Jackson*, *supra,* 1 Cal.5th at p. 349.) Further, "'[w]e accord the prosecutor wide latitude in describing the factual deficiencies of the defense case.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 740.) "'Although a prosecutor is forbidden to comment '"either directly or indirectly, on the defendant's failure to testify in his defense,'" the prosecutor may comment '"on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses.'"'" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1333; accord, *People v. Thomas* (2012) 54 Cal.4th 908, 945.)

Here, Oberdiear's counsel told the jury in his closing argument that the People had failed to introduce Oberdiear's cell phone records, which according to Oberdiear, would have conclusively shown whether or not the text messages had been spoofed. In his rebuttal, the prosecutor responded to this argument by pointing out that Oberdiear also could have presented that evidence, but failed to do so. In particular, the prosecutor argued to the jury that Oberdiear had "the exact same subpoena power" as the People and Oberdiear had "every right to call any witness that [he] want[ed] to come in and talk to you

59

about the cell phone records." However, Oberdiear did not call anyone to testify about his cell phone records and whether the text messages in evidence were consistent with those records.[7]

Oberdiear contends that, because "the prosecution knew that counsel certainly did not have the time to obtain such records due to the court erroneously denying any continuances," the prosecutor's statement was "equivalent to telling the jury that they did not see evidence of a certain fact when such evidence had been excluded on the prosecution's motion." The cases on which Oberdiear relies to support this argument, *People v. Varona* (1983) 143 Cal.App.3d 566 and *People v. Castain* (1981) 122 Cal.App.3d 138, are inapposite. In both cases, the People successfully obtained exclusion of certain evidence, and then misled the jury about whether such evidence existed or what it would have shown. (*Varona*, at p. 570 [after obtaining exclusion of evidence that victim was on probation for prostitution, prosecutor told jury in closing argument that victim was not a prostitute "although he had seen the official records and knew

---

**7**     In overruling Oberdiear's objection to the prosecution's argument, the trial court explained: "The defense rested on the state of evidence, but there is a long line of cases that if you bring up the People's failure to bring in some evidence in your argument, which you did regarding the absence of the phone records, it is fair argument for the prosecution to point out to the jury that the defense does enjoy the free power of the subpoena to bring in these records. The jurors were told that neither side has to bring in all the evidence or any particular evidence. So in response to -- in the context of responding to your argument: where are these phone records? It is fair game, particularly in the manner in which [the prosecutor] made that argument, that the defense could have brought in that."

60

that he was arguing a falsehood"]; *Castain*, at p. 146 [after prosecutor obtained exclusion of arresting officer's multiple acts of excessive force, prosecutor argued to jury that there was only one such prior incident].)

In this case, the People did not seek to exclude Oberdiear's cell phone records. While the People did oppose Oberdiear's midtrial motion for a continuance, the People never argued that Oberdiear should be precluded from introducing the cell phone records at trial or from calling any witnesses to testify about those records. Based on Oberdiear's threatening text messages, the People filed the felony complaint against Oberdiear in May 2014 and the trial commenced in May 2017. Oberdiear maintains that his "primary defense," spoofing, was the "heart of the case." According to Oberdiear, his cell phone records would have conclusively shown whether spoofing occurred. Yet, with three years to prepare for trial, Oberdiear did not obtain his cell phone records to support his "primary defense." Further, there is no indication that the People caused Oberdiear's failure to obtain his cell phone records. The prosecutor's argument constituted a fair comment on the state of the evidence and Oberdiear's failure to provide identifiable evidence to support his spoofing defense.

F.     *Oberdiear Is Entitled to a Hearing on His Eligibility for Mental Health Diversion*

Oberdiear argues the matter should be remanded for the trial court to consider his eligibility for mental health diversion pursuant to section 1001.36. Oberdiear asserts that remand is required because the statute applies retroactively and that he meets the threshold criteria for an eligibility hearing. Based on the Supreme Court's decision in *Frahs, supra,* 9 Cal.5th 618, we conditionally reverse Oberdiear's convictions and sentence and

61

remand for the trial court to consider Oberdiear's eligibility for diversion.

### 1. *Relevant Background*

The jury convicted Oberdiear on May 31, 2017, and the trial court sentenced him on November 13, 2017. Prior to sentencing, Oberdiear's counsel informed the trial court that he was concerned about Oberdiear's ability to understand the nature of the proceedings and to assist in preparing for his sentencing hearing. Counsel reported that he had formed a doubt about Oberdiear's mental competence based on Oberdiear's recent conduct "in lockup" as well as "his behavior in court" where he "spent a great deal of time mumbling under his breath and saying things . . . that did not logically relate to the proceeding." The trial court stated that it also had a "doubt" about whether Oberdiear was presently competent, and ordered the proceedings suspended pursuant to section 1368 for a mental competence evaluation.

In July 2017, Dr. Gordon Plotkin, the court-appointed psychiatrist, completed a mental competence evaluation of Oberdiear. Plotkin found that Oberdiear "may be suffering from a Major Mental Disease, Disorder, or Defect, but that disorder/symptoms do not interfere with his ability to cooperate with working with his counsel and proceeding with sentencing." While Dr. Plotkin was unable to confirm a diagnosis at that time, he stated that "[i]t is entirely possible that [Oberdiear] is suffering from some type of endogenous psychiatric illness such as Schizophrenia."

Prior to sentencing, the trial court also ordered a diagnostic study for Oberdiear pursuant to section 1203.03 to determine his suitability for probation. After evaluating Oberdiear, the

62

correctional counselor stated that his conduct at issue "seems to stem from some sort of mental deficiency" and that he "would benefit from psychological treatment and counseling." The prison psychologist who evaluated Oberdiear found that he had traits of antisocial personality disorder and possible substance abuse problems, but did not diagnose him with a specific mental disorder.

2. *Oberdiear Is Entitled to a Hearing on His Eligibility for Mental Health Diversion*

Effective June 27, 2018, "the Legislature enacted sections 1001.35 and 1001.36 as part of Assembly Bill No. 1810 (2017-2018 Reg. Sess.) . . . . [Citation.] Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (§ 1001.36, subd. (a).)" (*Frahs*, *supra*, 9 Cal.5th at p. 626.) "The stated purpose of the diversion statute 'is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' (§ 1001.35, subds. (a)-(c).)" (*Frahs*, at p. 626.)

Section 1001.36 defines "pretrial diversion" as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . ." (§ 1001.36, subd. (c).) If

63

a defendant is charged with a qualifying offense,[8] a trial court may grant pretrial diversion if it finds all of the following:  (a) the defendant suffers from a qualifying mental disorder; (b) the mental disorder was a significant factor in the commission of the charged offense; (c) in the opinion of a qualified mental health expert, the defendant's symptoms will respond to mental health treatment; (d) the defendant consents to diversion and waives his or her right to a speedy trial; (e) the defendant agrees to comply with treatment as a condition of diversion; and (f) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community.  (*Id.*, subd. (b)(1)(A)-(F).)

If the six criteria in section 1001.36, subdivision (b)(1), are met, and if the trial court "is satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant" (§ 1001.36., subd. (c)(1)(A)), the court may order diversion into an approved mental health treatment program for up to two years.  (*Id.*, subd. (c)(1) & (3)).  If the defendant commits an additional offense or otherwise performs unsatisfactorily in the diversion program, the court may reinstate the criminal proceedings.  (*Id.*, subd. (d).)  "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion," and "the arrest upon which the diversion was based shall be deemed never to have occurred . . . ."

---

[8]     A defendant may not be placed into a diversion program for the charged offenses of murder, manslaughter, use of a weapon of mass destruction, or certain enumerated sex offenses.  (§ 1001.36, subd. (b)(2).)

(*Id.*, subd. (e).)

In *Frahs, supra*, 9 Cal.5th 618, the Supreme Court held that section 1101.36 "applies retroactively to cases in which the judgment is not yet final . . . ." (*Id.* at p. 624, 637.) The Court also held that "a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when . . . the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion–the defendant suffers from a qualifying mental disorder (§ 1001.36, subd. (b)(1)(A))."[9] (*Frahs,* at p. 640.) In so holding, the Court expressly rejected the People's contention that a defendant must demonstrate that he or she satisfies all six threshold eligibility requirements before remand to the trial court is proper. (*Id.* at pp. 637-638.) The Court reasoned that "imposing such a high bar in the posture of proceedings such as these would be unduly onerous and impractical." (*Id.* at p. 638.) The Court further held:

---

**9** In *Frahs*, the Court affirmed the conditional reversal of "defendant's convictions and sentence with the following instructions for the trial court in considering defendant's eligibility for diversion under section 1001.36: 'If the trial court finds that [defendant] suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If [defendant] successfully completes diversion, then the court shall dismiss the charges. However, if the court determines that [defendant] does not meet the criteria under section 1001.36, or if [defendant] does not successfully complete diversion, then his convictions and sentence shall be reinstated.'" (9 Cal.5th at pp. 640-641.)

65

"[R]equiring defendants to show they would meet all threshold eligibility requirements before the appellate court may remand the case to the trial court—which decides in the first instance whether a defendant is eligible for diversion—would be inconsistent with any sensible retroactive application of the statute.  That, in turn, would run counter to our usual inference that the Legislature intends ameliorative statutes like this one to apply as broadly as possible within the constraints of finality—an inference that has not been rebutted here." (*Ibid.*)

Here, the People argue that Oberdiear has not made a prima facie showing of eligibility for diversion because the first criterion requires evidence of a qualifying mental disorder,[10] which "shall include a recent diagnosis by a qualified mental health expert." (§ 1001.36, subd. (b)(1)(A).)  The People assert the record does not contain the requisite diagnosis because Plotkin merely opined that Oberdiear "may have a Major Mental Disorder," but stated he was "unable to confirm that at this time."  We conclude that the record sufficiently demonstrates that Oberdiear "appears to meet at least the first threshold eligibility requirement." (*Frahs, supra*, 9 Cal.5th at p. 640).

Plotkin's section 1368 report, which was not prepared in anticipation of a mental health diversion eligibility hearing, indicated that Oberdiear presented with certain symptoms that may be associated with a major mental disorder and that it is

---

[10]    A qualifying medical disorder is one "identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia." (§ 1001.36, subd. (b)(1)(A).)

"entirely possible" he is suffering from a "psychiatric illness such as Schizophrenia."  The section 1203.03 report, which also was prepared for purposes unrelated to mental health diversion, stated that Oberdiear's crimes in this case appear to be a consequence of "some sort of mental deficiency," and specifically recommended that Oberdiear receive psychological treatment and counseling to address "his mental health and anger issues."  Although neither report included a definitive diagnosis by a qualifying mental health expert, they each reflect that "there is evidence in the record that appears to support the first of the statute's threshold eligibility requirements."  (*Frahs*, *supra*, 9 Cal.5th at p. 640).

Accordingly, Oberdiear is entitled to a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing under section 1001.36.  (*Frahs*, *supra*, 9 Cal.5th at p. 640.)  If the trial court exercises its discretion to grant diversion, and if Oberdiear successfully completes diversion, then the trial court shall dismiss the charges.  (*Id.* at p. 641.)  If, however, the trial court determines that Oberdiear is ineligible for diversion or declines to exercise its discretion to grant diversion, or if Oberdiear does not successfully complete diversion, the trial court shall reinstate his convictions on the stalking and making a criminal threat counts and conduct the further proceedings set forth below.

G.   *If the Trial Court Resentences Oberdiear, He May Request a Hearing on His Ability To Pay Any Fine and Assessment the Trial Court Imposes*

At Oberdiear's sentencing, the trial court imposed $120 in court facilities assessments (Gov. Code, § 70373; $30 per count), $160 in court operations assessments (§ 1465.8; $40 per count)

67

and a $1,800 restitution fine (§ 1202.4, subd. (b).)[11]  Although
Oberdiear did not object to the imposition of the assessments and
the fine or raise his inability to pay, Oberdiear asserts
that, under this court's holding in *People v. Dueñas* (2019) 30
Cal.App.5th 1157 (*Dueñas*), the trial court violated his federal
and state constitutional rights to due process by imposing the
assessments and fine without inquiring about his ability to pay.
We conclude that, if the trial court resentences Oberdiear, he
should have an opportunity on remand to request a hearing and
present evidence to establish his inability to pay the amounts the
trial court imposes.

### 1.    Dueñas *and Its Progeny*

In *Dueñas, supra*, 30 Cal.App.5th 1157, this court held that
it violated due process under both the United States and
California Constitutions to impose a court operations assessment
by section 1465.8 or the court facilities assessment mandated by
Government Code section 70373, neither of which is intended to
be punitive in nature, without first determining the convicted
defendant's ability to pay.  (*Dueñas,* 30 Cal.App.5th at p. 1168;
accord, *People v. Belloso* (2019) 42 Cal.App.5th 647, 654-655
(*Belloso*), review granted Mar. 11, 2020, S259755.)  A restitution

---

[11]    The trial court explained its calculation of the restitution
fine:  "He's ordered to pay a restitution fine of $1800.  The court
utilizes the formula as outlined in Penal Code section
1202.4(b)(2), $300 multiplied by the number of years on the
principal term which is three years.  That's $900 multiplied by
the felony convictions that were not subject to being stayed
pursuant to section 654.  That's count 6, count 4.  That's two
felony convictions.  That equals $1800."

fine under section 1202.4, subdivision (b), in contrast, is intended to be, and is recognized as, additional punishment for a crime. (*Dueñas*, 30 Cal.App.5th at p. 1169; *Belloso*, *supra,* 42 Cal.App.5th at p. 655.) Section 1202.4, subdivision (c), provides a defendant's inability to pay a restitution fine may not be considered a "compelling and extraordinary reason" not to impose a restitution fine; inability to pay may be considered "only in increasing the amount of the restitution fine" above the minimum required by statute. To avoid the serious constitutional question raised by imposition of such a fine on an indigent defendant, we held that "although the trial court is required by . . . section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas*, *supra,* 30 Cal.App.5th at p. 1172, accord, *Belloso*, *supra,* 42 Cal.App.5th at p. 655.)

### 2.    *Oberdiear May Request a Hearing*

Oberdiear requests we remand the case for the trial court to conduct an ability-to-pay hearing in accordance with our opinion in *Dueñas*. The People contend Oberdiear forfeited the issue by not raising it at trial. Although recognizing we have rejected similar forfeiture arguments in the past (see *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 ["[w]hen, as here, the defendant's challenge on direct appeal is based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial, reviewing courts have declined to find forfeiture"]; see generally *People v. Brooks* (2017) 3 Cal.5th 1, 92 ["'[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law

69

then in existence'"]), the People argue forfeiture should apply in this case because, at the time of his sentencing hearing, Oberdiear had an existing right under section 1202.4, subdivision (d), to challenge imposition of a restitution fine above the $300 statutory minimum.

Although Oberdiear could have challenged the trial court's imposition of the restitution fine to the extent it was above the statutory minimum, "neither forfeiture nor application of the forfeiture rule is automatic." (*People v. McCullough* (2013) 56 Cal.4th 589, 593; accord, *In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded in part by statute as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) Here, neither the trial court nor Oberdiear's counsel had the benefit of our decision in *Dueñas*, and the court understandably did not advise Oberdiear he had a due process right to argue he did not have the ability to pay the fine and assessments imposed. Because we must remand this case in any event to permit the trial court to resolve other issues, if the trial court resentences Oberdiear, the court shall allow Oberdiear an opportunity to request a hearing and present evidence demonstrating his inability to pay. (Cf. *In re S.B.*, at p. 1293 [the purpose of the forfeiture rule "is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected"].)

## DISPOSITION

We reverse Oberdiear's conviction on count 6 for intent to extort. We conditionally reverse the remaining convictions and the sentence and direct the trial court to conduct a hearing on Oberdiear's eligibility for mental health diversion under section 1001.36. If the court determines Oberdiear qualifies for diversion, then it may grant diversion. If Oberdiear successfully

70

completes diversion, then the court shall dismiss the charges. If the court determines Oberdiear is ineligible for diversion or declines to exercise its discretion to grant diversion, or if Oberdiear does not successfully complete diversion, the trial court shall reinstate the convictions on the stalking and making a criminal threat counts, and the People shall have 60 days to determine whether to retry Oberdiear on the section 523 count. If the People decide not to retry him on that count, or after the retrial of the section 523 count, the court shall resentence Oberdiear. In the event the trial court resentences Oberdiear, the court shall allow Oberdiear an opportunity to request a hearing and present evidence regarding his inability to pay any fine or assessment the court imposes. If the court determines Oberdiear does not have the ability to pay the restitution fine, the court must stay its execution.


DILLON, J.[*]


We concur:


SEGAL, Acting P. J.          FEUER, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

71